Filed 8/25/16  P. v. Castillo CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>FRANK RUBEN CASTILLO,<br><br>Defendant and Appellant. | F068969<br><br>(Super. Ct. No. F12902660)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Wayne R. Ellison, Judge.

Han N. Tran, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Jesse Witt, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Frank Castillo appeals from a judgment of conviction of second degree murder (Pen. Code,[1] § 187, subd. (a)).  The victim, who was attacked while lying passed out

---

[1] Except where otherwise specified, all statutory references are to the Penal Code.

drunk on a sleeping bag, sustained fatal injuries from being kicked in the head.  Castillo admitted responsibility for the victim's death, but argued for a verdict of manslaughter.  A jury found that he acted with malice.

The only claim on appeal is ineffective assistance of counsel based on the failure to object to evidence of a prior act of violence.  As will be explained, the alleged error was harmless.  We therefore affirm the judgment.

## STATEMENT OF THE CASE

Castillo was charged with murder in the death of John Salvio, Jr. (Salvio).  It was further alleged that Castillo had suffered a prior strike and serious felony conviction (§§ 667, subds. (a), (b)-(i), 1170.12, subds. (a)-(d)), and had served three prior prison terms within the meaning of section 667.5, subdivision (b).  The murder count was tried by jury.  The enhancement allegations were bifurcated, but Castillo admitted the truth of those allegations at the conclusion of trial.

The prosecution called 17 witnesses to establish a rather convoluted set of facts involving a group of homeless people in southeast Fresno.  At the heart of the case was an alleged love triangle between Castillo, Salvio, and a woman named Vicky Guerrero.  We provide an abbreviated summary of the trial evidence, focusing on the information essential to our analysis of the ineffective assistance claim.

On April 7, 2012, police responded to a report of domestic violence near East Tulare Avenue and North 2nd Street, an area where homeless individuals frequently congregated and slept.  Upon arrival, the investigating officer made contact with Salvio and Vicky Guerrero.  Both of them were visibly drunk.  Salvio complained that his girlfriend, Ms. Guerrero, had punched him in the mouth and taken his cell phone.  Ms. Guerrero was arrested for public intoxication and disturbing the peace.

Castillo allegedly learned of Ms. Guerrero's arrest the following evening while drinking beer with James Paxton, another homeless person who was mutually acquainted with Castillo and Salvio.  Although Mr. Paxton denied informing Castillo of

2.

Ms. Guerrero's arrest, his trial testimony confirmed that he and Castillo had a discussion about Salvio immediately prior to the subject incident. The conversation took place outside of a convenience store on the northeast corner of East Tulare Avenue and North 1st Street, i.e., one block over from where Salvio customarily slept at night. Castillo told Mr. Paxton that he loved Ms. Guerrero, that the two of them had been dating off and on, and that he was unhappy about her romantic relationship with Salvio. He also expressed anger over Salvio's involvement in Ms. Guerrero's recent arrest. The conversation ended with Castillo walking off in the direction of East Tulare Avenue and North 2nd Street after stating his intention to confront Salvio about these grievances.

Yang Moua and Jeffrey Branning witnessed Castillo's subsequent encounter with Salvio. With the assistance of a Hmong language interpreter, Mr. Moua testified that he had been sleeping next to Salvio when Castillo appeared and began kicking Salvio in the head. Castillo cursed at Salvio throughout the attack, but Salvio did not respond or attempt to defend himself.

Jeffrey Branning provided a more detailed account of the incident. Mr. Branning had been sleeping in the same encampment as Salvio and Mr. Moua when he awoke to the sound of yelling. He saw Salvio lying down and Castillo standing over him, cursing and demanding that Salvio get up. Salvio did not respond, and Mr. Branning initially suspected that he was pretending to sleep to avoid the confrontation. Castillo lifted up his foot and brought it crashing down on Salvio's head, "like you would to smash a pumpkin or stomp a divot into the ground if you play golf…. And then he started kicking him … kicking his head like a soccer ball." Mr. Branning estimated that Castillo stomped on Salvio's head approximately five to six times and kicked him eight or nine times. Castillo delivered the blows with "unbridled" force, "like somebody trying to kick a field goal [with a football], only he was using [Salvio's] head."

Although Mr. Branning considered Salvio to be one of his best friends, he did not intervene and quickly departed from the area with Mr. Moua. He expressed regret over

3.

this decision at trial, explaining that he was afraid of Castillo because Castillo had punched him in the face on a prior occasion. Castillo's claim on appeal is based on the admission of Mr. Branning's statements about the previous assault.

After leaving the scene, the two eyewitnesses met up with James Paxton at a nearby establishment. Castillo joined them approximately five to ten minutes later and bought drinks for the entire group. Shortly thereafter, Mr. Paxton went to check on Salvio and found him lying motionless, face down on the ground. Concerned that Salvio was not breathing, he went back across the street and told Mr. Branning to call 911. Paramedics soon arrived and transported Salvio to a local hospital. He was pronounced dead in the early morning hours of April 9, 2012.

Vicky Guerrero testified that Castillo later told her about what he had done to Salvio. She remembered him complaining of "throbbing" foot pain. According to Ms. Guerrero's testimony, Castillo was not immediately aware that he had killed the victim. Castillo knew that he "hurt him really bad," but assumed Salvio had at worst suffered a concussion or fallen into a coma.

Police officers located and arrested Castillo on April 12, 2012. He had by then obtained a new set of clothing, but neglected to discard his bloody footwear. Forensic analysis showed that the shoes Castillo was wearing at the time of his arrest contained traces of Salvio's DNA.

Dr. Venu Gopal, the pathologist who performed an autopsy on the victim's body, testified to the nature of his injuries and the cause of death. Toxicology results showed that Salvio had a blood alcohol level of .37 milligrams percent. Despite the dangerously high level of alcohol in his system, Dr. Gopal determined the cause of death to be "head injury due to multiple blunt impacts."

Salvio sustained a depressed fracture above the right eyebrow. Such an injury is caused when a bone is broken and pushed inward, causing a depression. In other words, the right frontal bone of the victim's skull was pushed in toward his brain, which caused

4.

an indentation measuring 1.5 x 1 inches. Dr. Gopal testified that this would have required a "severe degree of force." In addition to the depressed fracture, the pathologist documented 22 bruises, scrapes, and lacerations on the victim's face. There were no defensive wounds.

The defense strategy was to acknowledge culpability for the homicide and argue for a verdict of something less than first degree murder. In his opening statement, defense counsel told the jury that the evidence would show Castillo was responsible for Salvio's death, but never formed the intent to kill. As trial progressed, it became apparent counsel was hoping to establish the affirmative defense of voluntary intoxication. There was no evidence of how much alcohol Castillo had consumed at the time of the killing, but the defense relied on the impressions of a lay witness who said she believed he was drunk on the night in question.

At the close of evidence, defense counsel made a motion for acquittal pursuant to section 1118.1 as to the issue of premeditation and deliberation. The trial court granted the motion based on its conclusion that, while the evidence supported a finding of conscious disregard for life and the intent to kill, there was insufficient evidence to prove first degree murder beyond a reasonable doubt. Accordingly, the jury was instructed on second degree murder and the lesser included offenses of voluntary and involuntary manslaughter.

Castillo's trial counsel reiterated the defense theory during closing argument: "I'm going to ask you, frankly, ladies and gentlemen, to find Frank Castillo guilty. … I'm going to ask you to find him guilty of involuntary manslaughter." Counsel went on to argue that Castillo neither intended to kill the victim nor realized his actions could be lethal, and thus did not act with a conscious disregard for life.

The jury found Castillo guilty of second degree murder. He was sentenced to a total prison term of 35 years to life based on the mandatory punishment of 15 years to life, which was doubled because of the prior strike and further enhanced by a consecutive

five-year term for the prior serious felony conviction.  The trial court exercised its discretion to strike the enhancements for Castillo's prior prison terms.

## DISCUSSION

Castillo submits that the testimony of witness Jeffrey Branning regarding a prior assault and battery was inadmissible under Evidence Code section 1101, subdivision (a). Recognizing that the question of admissibility is a forfeited issue (Evid. Code, § 353), Castillo presents a claim of ineffective assistance of counsel based on his trial attorney's failure to lodge an objection.  For the reasons that follow, we conclude the alleged error was harmless.

Additional Background

Defense counsel moved in limine to "preclude admission of defendant's prior bad acts."  When the motion was heard, the prosecution said it would not seek to introduce evidence of any prior arrests or convictions, but made clear its intention to present "testimony from Mr. Branning that the defendant had struck him previously," which the witness had testified to at the preliminary hearing.  Defense counsel was unconcerned with this evidence, telling the court, "No issue there, Your Honor," and confirmed that the motion in limine pertained to Castillo's prior criminal convictions.  Thus, it came as no surprise to anyone when the prosecution elicited from Mr. Branning the testimony of which Castillo now complains.

The witness testified that he and Castillo had a physical altercation a "couple months before" Salvio was killed.  He explained: "[Castillo] was seeing somebody that I was seeing at the same time – not at the same time, but we [were] both seeing the same girl. … [H]e made a comment and started wailing on me right there where I was sitting at.  And they had to come stop him and stuff from continuing at that time."  When asked to confirm there had been an assault, Mr. Branning replied, "[He] actually hit me and knocked me off my crate that I was sitting on, yeah."  The witness later clarified that Castillo struck him once in the jaw with a "closed hand."

6.

Analysis

Claims of ineffective assistance of counsel made on direct appeal are disfavored and often unsuitable for review. (*People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9. ["It is rarely appropriate to resolve an ineffective assistance claim on direct appeal."].) "On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

Reviewable claims of ineffective assistance are subject to a two-part analysis. The appellate court considers whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and if so, whether the defendant suffered prejudice. (*People v. Carter* (2003) 30 Cal.4th 1166, 1211.) "Prejudice requires 'a reasonable probability that a more favorable outcome would have resulted . . ., i.e., a probability sufficient to undermine confidence in the outcome.' " (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1241.) Numerous appellate decisions advise that the failure to make an objection rarely amounts to constitutionally deficient performance. (E.g., *People v. Castaneda* (2011) 51 Cal.4th 1292, 1335; *People v. Lopez* (2008) 42 Cal.4th 960, 972.) In the interest of judicial economy, we reject appellant's claim based on the absence of prejudice without deciding the question of deficient performance or the issue of cognizability on direct appeal. (See *Strickland v. Washington* (1984) 466 U.S. 688, 697 ["If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."].)

We begin with Castillo's position concerning the admissibility of the challenged testimony. Evidence Code section 1101, subdivision (a) generally prohibits propensity

7.

evidence, i.e., evidence tending to show the defendant's disposition to commit a certain type of act, if such evidence is "offered to prove his or her conduct on a specified occasion." Considering appellant conceded the actus reus of the charged offense, and the overwhelming evidence of that element notwithstanding his concession, it is highly unlikely that the prior altercation with Mr. Branning had any impact on the jury's conclusions regarding his conduct on the night in question. The only issue in dispute was his mens rea.

In the reply brief, Castillo confusingly argues that "evidence of the prior incident allowed the jury to conclude that [he] had an intent to kill." Pursuant to Evidence Code section 1101, subdivision (b), evidence of a defendant's prior bad acts is admissible "to raise an inference of (and hence prove) his motive or intent when he committed his crimes." (*People v. Jones* (2013) 57 Cal.4th 899, 952.) If the challenged testimony was probative of intent, it was admissible as an exception to the general rule against propensity evidence. Therefore, an objection by defense counsel pursuant to Evidence Code section 1101, subdivision (a) would have most likely resulted in a balancing analysis by the trial court under Evidence Code section 352. How the trial court would have exercised its discretion in that situation is a matter of speculation, which undermines Castillo's claim of prejudice.

Defense counsel understood there was no legitimate possibility of an acquittal. The best result Castillo could have hoped for was a verdict of voluntarily or involuntary manslaughter. In reality, however, the chances of him securing either of those outcomes were remote.

Voluntary and involuntary manslaughter are lesser included offenses of murder. (*People v. Thomas* (2012) 53 Cal.4th 771, 813.) Murder requires malice, which can be express or implied. Express malice exists where there is an intent to kill, and malice is implied "when a person willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious

8.

disregard for the danger to life that the act poses." (*People v. Gonzalez* (2012) 54 Cal.4th 643, 653.) To reduce the crime of murder to voluntary manslaughter, malice must be negated by provocation or the honest but unreasonable belief in a need to defend against imminent peril. (*People v. Rangel* (2016) 62 Cal.4th 1192, 1225-1226; *People v. Elmore* (2014) 59 Cal.4th 121, 133-134.) There was no evidence to support a claim of imperfect self-defense. As for provocation, the law requires proof of instigating behavior by the victim, meaning "the victim must taunt the defendant or otherwise initiate the provocation." (*People v. Carasi* (2008) 44 Cal.4th 1263, 1306.) By all accounts, Salvio was lying down when Castillo attacked him and had done nothing that could be construed as legal provocation. With or without the propensity evidence, the likelihood of a voluntary manslaughter verdict was essentially non-existent.

Involuntary manslaughter refers to the killing of another "in the commission of an unlawful act, not amounting to a felony[,] or [during] the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192, subd. (b).) In this context, acting without "due caution and circumspection" refers to criminal negligence. (*People v. Guillen* (2014) 227 Cal.App.4th 934, 1027.) " 'If a defendant commits an act endangering human life, without realizing the risk involved, the defendant has acted with criminal negligence. By contrast where the defendant realizes and then acts in total disregard of the danger, the defendant is guilty of murder based on implied malice.' " (*Ibid*.) Although Castillo's voluntary intoxication defense was relevant to the issue of intent, it could not be relied upon to refute the prosecution's theory of implied malice. (*People v. McNally* (2015) 236 Cal.App.4th 1419, 1431-1432 ["Voluntary intoxication does not negate implied malice."]; *People v. Turk* (2008) 164 Cal.App.4th 1361, 1374-1377 [same].) The uncontroverted testimony of Dr. Gopal regarding the amount of force it would have taken to cause the depressed fracture of Salvio's skull probably ensured the outcome of the

9.

case. Castillo fails to explain how the jury could have reasonably believed that he did not act with at least implied malice, i.e., a conscious disregard for life.

Finally, a single punch is less egregious than the vicious behavior that resulted in the victim's death. The strength of the prosecution's case, combined with the relatively pedestrian nature of the prior bad act, minimized the danger of prejudice. (See *People v. Ewoldt* (1994) 7 Cal.4th 380, 404 [potential for prejudice is reduced when the evidence of prior misconduct is no more inflammatory than the testimony concerning the charged offense].) In light of the surrounding circumstances, it is not reasonably probable that Castillo would have obtained a more favorable result at trial but for his attorney's failure to object to the testimony about a prior act of violence.

## **DISPOSITION**

The judgment is affirmed.

_____
GOMES, Acting P.J.

WE CONCUR:


_____
DETJEN, J.


_____
FRANSON, J.

10.